1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KATHLEEN D. JOHNSON,

11              Plaintiff,                    No. CIV S-08-0182 GGH

12        vs.

13
     MICHAEL J. ASTRUE,                       ORDER
14   Commissioner of
     Social Security,
15
                Defendant.
16   _____/

17              Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18   Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB")

19   and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act

20   ("Act").  For the reasons that follow, plaintiff's Motion for Summary Judgment is DENIED, the

21   Commissioner's Cross Motion for Summary Judgment is GRANTED, and the Clerk is directed

22   to enter judgment for the Commissioner.

23   BACKGROUND

24              Plaintiff, born April 30, 1965, applied on March 10, 1997 for disability benefits.

25   (Tr. at 65, 53.)  Plaintiff alleged she was unable to work due to systemic lupus and rheumatoid

26   arthritis.  (Tr. at 64.)  Plaintiff was found disabled by an ALJ on December 15, 1998; however,

                                              1

1   on October 23, 2002, the Commissioner determined that plaintiff was no longer disabled as of

2   August, 2002.  (Tr. at 53-56, 73.)   Plaintiff filed a request for reconsideration which was denied,

3   and a timely appeal which was granted.  (Tr. at 77, 79, 91, 262-65.)  Plaintiff requested and

4   received a hearing on January 13, 2006.[1]  (Tr. at 356.)

5       In a decision dated November 24, 2006, ALJ John J. Madden, Jr. determined

6   plaintiff was not disabled.  The ALJ made the following findings:[2]

7       1.    The most recent favorable medical decision finding that the
       claimant was disabled is the decision dated December 25,
8             1998.  This is known as the "comparison point decision" or
       CPD.

9

10  ───────────────────

11  [1] The hearing was rescheduled two times when plaintiff did not appear, one time due to her incarceration, and the other time because the SSA sent plaintiff's notice to a wrong address. Def.'s Cross-Mot. at 2.

12

13  [2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

    Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
    Step two:  Does the claimant have a "severe" impairment? If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
    Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
    Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
    Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
    The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

2. At the time of the CPD, the claimant had the following medically determinable impairments: systemic lupus and rheumatoid arthritis.  These impairments were found to meet sections 1.02(A) and (B) of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

3. Through February 1, 2003, the date the claimant's disability ended, the claimant did not engage in substantial gainful activity (20 CFR 404.1594(f)(1)).

4. The medical evidence establishes that, as of February 1, 2003, the claimant had the following medically determinable impairments: systemic lupus, rheumatoid arthritis, fibromyalgia, degenerative disc disease in the lumbar spine, gastro-esophageal reflux disease, history of a broken finger status post repair, and obesity.

5. As of February 1, 2003, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

6. Medical improvement occurred as of February 1, 2003 (20 CFR 404.1594(b)(1) and 416.994(b)(1)(i)).

7. The medical improvement is related to the ability to work because, as of February 1, 2003, the impairments present at the time of the CPD no longer met or medically equaled a listing (20 CFR 404.1594(c)(3)(i) and 416.994(b)(2)(iv)(A)).

8. As of February 1, 2003, the claimant continued to have a severe impairment or combination of impairments (20 CFR § 404.1594(f)(6) and 416.994(b)(5)(v)).

9. Based on the impairments present as of February 1, 2003, the claimant has the residual functional capacity to occasionally lift and carry 20 pounds, frequently lift and carry ten pounds, stand and/or walk for six hours in an eight hour day, sit for six hours in an eight hour day, and do unlimited pushing and pulling.  She can occasionally climb, balance, stoop, kneel, crouch, and crawl.  She needs to avoid concentrated exposure to extreme cold, fumes, dusts, odors, gases, poor ventilation, and hazards.

10. As of February 1, 2003, the claimant was unable to perform past relevant work (20 CFR 404.1565 and 416.965).

11. On February 1, 2003, the claimant was a younger individual age 18-44 and continues to remain in that category (20 CFR

1    404.1563 and 416.963).

2    12.   The claimant has at least a high school education and is
          able to communicate in English (20 CFR 404.1564 and
3          416.964).

4    13.   Beginning on February 1, 2003, transferability of job skills
          is not material to the determination of disability because
5          using the Medical-Vocational Rules as a framework
          supports a finding that the claimant is "not disabled,"
6          whether or not the claimant has transferable job skills (See
          SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
7
8    14.   As of February 1, 2003, considering the claimant's age,
          education, work experience, and residual functional
9          capacity based on the impairments present as of February 1,
          2003, the claimant was able to perform a significant
10          number of jobs in the national economy (20 CFR
          404.1560(c), 404.1566, 416.960(c), and 416.966).

11   15.   The claimant's disability ended as of February 1, 2003 (20
          CFR 404.1594(f)(8) and 416.994(b)(5)(vii)).
12

13   (Tr. at 22-35.)

14          Therefore, the question is whether the ALJ's decision that plaintiff's disability

15   ended on February 1, 2003, was proper.  Where plaintiff was previously awarded disability

16   benefits, there is a presumption of continuing disability.  Bellamy v. Secretary of Health &

17   Human Services, 755 F.2d 1380, 1381 (9th Cir. 1985), citing Murray v. Heckler, 722 F.2d 499,

18   500 (9th Cir. 1983).  It is the Secretary's burden to come forward with evidence to rebut this

19   presumption.  Id.  To determine medical improvement, the Secretary "compare[s] the current

20   medical severity of that impairment(s) which was present at the time of the most recent favorable

21   medical decision that [plaintiff was] disabled or continued to be disabled to the medical severity

22   of that impairment(s) at that time."  20 C.F.R. § 404.1594(b)(7).  The comparison point date

23   ("CPD") is compared to the plaintiff's present condition.

24   ISSUES PRESENTED

25          Plaintiff has raised the following issues: A.  Whether the ALJ Erroneously Relied

26   on Two Reports Submitted After the Hearing; B.  Whether the ALJ's Hypothetical to the

4

1  Vocational Expert Was Inadequate as a Matter of Law; and C. Whether the ALJ Erroneously

2  Failed to Accept the Assessment of Plaintiff's Treating Physician.

3  LEGAL STANDARDS

4          The court reviews the Commissioner's decision to determine whether (1) it is

5  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

6  the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

7  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

8  Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

9  as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

10  625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ

11  is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

12  ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

13  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

14  rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

15  ANALYSIS

16      A.  Whether the ALJ Erroneously Relied on Two Reports Submitted After the Hearing

17          Plaintiff objects to two medical reports submitted after the hearing, by Drs. Eder

18  and Nolan.

19          1.  Dr. Eder's Report

20          In regard to Dr. Eder's assessment, dated March 17, 2006, plaintiff claims it

21  constitutes hearsay and as such, was not properly admitted into evidence.[3]  The residual

22  functional capacity assessment by this SSA physician was given weight by the ALJ.  (Tr. at 31.)

23  It stated that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand

24  and/or walk for six hours in an eight hour day, sit for six hours in a day, and occasionally climb,

25  _____

26      [3]  Hearsay is routinely considered in Social Security administrative proceedings.  Plaintiff
means to attack the lack of authentication of the doctor's report and lack of foundation therefor.

1   balance, stoop, kneel, crouch, and crawl.  (Id. at 336-38.)  Plaintiff was to avoid concentrated

2   exposure to extreme cold, fumes, odors, dusts, gases, and hazards.  (Id. at 340.)

3                Plaintiff asserts that there is no documentary support for Dr. Eder's qualifications

4   as a licensed physician, and the report was not signed by her, but rather contains this source's

5   name in typed format at the bottom of the report.   The report itself states under "medical

6   consultant's code next to the physician's digital signature: "19 Internal Medicine."  (Id. at 343.)

7   As to the qualification of this individual to practice medicine, the court takes note of Dr. Eder's

8   internal medicine practice in Salem, Oregon.  See www.vitals.com.  Although a rubber stamp

9   signature may not be acceptable, 20 C.F.R. § 404.1519n(e), the signature for Dr. Eder was

10   digitally entered and therefore is adequate.

11                Digital signatures are commonplace at this time, and often take the place of an ink

12   signature.  Indeed, the court takes judicial notice of its own CM/ECF procedures where important

13   judicial documents, even the present motions before the undersigned, are accompanied by a /s/ or

14   other type of digital signature.  Plaintiff makes no valid argument why digital signatures should

15   also not be recognized by the Social Security Administration – it is not a "rubber stamp"

16   signature.

17                Ample evidence in the record supports this report in any event.  The assessment,

18   which limits plaintiff to light work with postural limitations, contains a full page of single spaced

19   typewritten remarks supporting this finding, and covers review of records dating from November

20   7, 2002 through February 26, 2006.  (Id. at 343.)  They refer to pain medications taken for lupus,

21   rheumatoid arthritis, fibromyalgia and Raynaud's Syndrome.  Plaintiff reported that she was

22   doing much better because of back exercises.  (Id.)  Although tests were positive for Hepatitis C,

23   the levels did not approach listing level.  MRI of the spine indicated mild central spinal stenosis,

24   mild disc bulge with central stenosis and mild facet hypertrophy.  Plaintiff met the criteria for

25   fibromyalgia, but she was on no medications at the time Dr. Nolan examined her.  Dr. Eder

26   summarized Dr. Nolan's findings: "[o]nly 2/18 FM tender points positive.  Dr. Nolan noted exam

1  findings were not very impressive compared to her incredibly diffuse complaints. It was noted

2  that exam findings were supportive of dx of FM 2 months earlier." (Id.) Headaches were far less

3  frequent than in the past. Range of motion was fairly unremarkable. Dr. Eder also noted that

4  overall exam findings were not consistent with plaintiff's diffuse complaints. Dr. Eder also

5  restricted plaintiff functionally more than Dr. Nolan, explaining that the remainder of the file

6  supported a restriction in bending, twisting, turning and lifting. In regard to systemic lupus, the

7  ANA results supported this diagnosis; however, they did not indicate strong current activity.

8  Plaintiff was not receiving treatment for lupus at this time, which Dr. Eder thought would

9  improve or resolve her pain symptoms. It was proper for the ALJ to rely on this report as an

10 opinion of a non-examining physician. See 20 C.F.R. §§ 404.1527(f) and 416.927(f).

11            2.  Dr. Nolan's Report

12            Plaintiff objects to Dr. Nolan's report, dated February 26, 2006, claiming it was

13 not signed and that the ALJ had previously implicitly rejected Dr. Nolan's diagnosis. The ALJ

14 gave this report more weight than the records of plaintiff's treating physician, Dr. Shearer, in part

15 because he was a Board Certified Internal Medicine specialist who was more experienced and

16 knowledgeable regarding plaintiff's condition that Dr. Shearer, who was merely a general

17 practitioner. (Id. at 31.) This report was quite extensive, covering three and half single spaced

18 typewritten pages. (Id. at 344-47.) First, Dr. Nolan recorded plaintiff's subjective complaints,

19 which included pain all of the time which was severe and occurred four out of seven days.

20 Plaintiff, however, was taking no medication at this time. Although plaintiff complained of daily

21 headaches, her intense headaches had decreased significantly and now occurred only once a

22 month. (Id. at 344.)

23            On exam, plaintiff could stand and sit without problem. Her gait was normal, as

24 was tandem gait, Romberg, walking on toes and heels, and squat rise maneuver. Flexion of the

25 lumbar spine was 90 degrees. Extension was 20 degrees. (Id. at 345.) Testing for fibromyalgia

26 was positive at only one out of nine locations, with a conclusion of no fibromyalgia. Dr. Nolan

1    noted that although there were diagnoses of both rheumatoid arthritis and lupus, "traditionally,

2    when both diagnoses are present in the same individual one of the diagnoses represents a mistake

3    in misdiagnosis." (Id. at 346.) Dr. Nolan mentioned a history compatible with Raynaud's

4    phenomenon; however, he stated that plaintiff's complaints were "incredibly diffuse and

5    nonspecific in reference to neuromuscular presentation." (Id. at 346-47.)

6                    Dr. Nolan spent time discussing plaintiff's credibility:

7                    But notwithstanding her complaints of frequent joint pains, her
                     examination is quite unimpressive. I noted that she had alleged
8                    exam findings supportive of the diagnoses to [sic] fibromyalgia
                     just two months ago. In my experience there may be periodic
9                    variability on exam findings in that a person with clear-cut
                     evidence for the diagnosis may have a normal examination a
10                   number of months later. I find it surprising however that she
                     would have a supposedly positive evaluation just two months ago
11                   and have a definitely negative valuation after such a short duration.

12   (Id. at 347.)

13                   Dr. Nolan concluded that there was no reason to restrict the amount of sitting,

14   standing, and walking in a work day. Due to prior back complaints, this physician might limit

15   repetitive bending, twisting, and turning. He would limit lifting to 20 pounds frequently and 40

16   pounds occasionally. He would also limit repetitive high impact activities based on a possible

17   previously valid diagnosis of fibromyalgia. (Id.)

18                   Plaintiff objects to this report because it found that plaintiff had no severe

19   impairments, and the ALJ's opinion found the following impairments to be severe as based on

20   Dr. Shearer's records: systemic lupus, rheumatoid arthritis, fibromyalgia, degenerative disc

21   disease, gastro-esophageal reflux disease, history of broken finger, and obesity.[4] It is true that the

22

23          [4] The court is puzzled by plaintiff's failure to raise any issues with respect to an obesity
     analysis. While obesity is no longer a grounds for disability in a listing, it should be analyzed at
24   the various steps of the sequential analysis as it affects other maladies. However, while at the
     administrative level, the disability finding process is non-adversarial, Reed v. Massanari, 270
25   F.3d 838, 841 (9th Cir. 2001), such is not the case at the district court level. The undersigned
     will not raise theories on his own, and will presume that the medical personnel did take obesity
26   into account in determining the residual functional capacity of plaintiff. The ALJ did make note

1   ALJ found these severe impairments based for the most part on Dr. Shearer's records.  (Id. at 25.)

2   Nevertheless, the ALJ found that none of these impairments met or equaled a listing.  (Id.)

3   Furthermore, he specifically stated that although these impairments could have been expected to

4   produce some of plaintiff's symptoms, plaintiff was not totally credible in her statements

5   regarding the intensity, persistence, and limiting effects of the impairments.

6          The fact that Drs. Shearer and Nolan disagreed on the severity of these

7   impairments is not error.  An ALJ may properly rely upon only selected portions of a medical

8   opinion while rejecting other parts.  See, e.g., Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir.

9   1989) (ALJ's supported reliance on selected portions of conflicting opinion constitutes

10  substantial evidence).  However, such selective reliance must be consistent with the medical

11  record as a whole.  See, e.g., Edlund v. Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001) (ALJ

12  cannot reject portion of medical report that is clearly reliable).  Here, reliance on one physician's

13  findings of severe impairments is not necessarily inconsistent with another physician's findings

14  of no severe impairment as the legal threshold for a step two finding is so low.  Consequently,

15  contrary to plaintiff's continued assertions, the ALJ did not either implicitly or expressly reject

16  Dr. Nolan's opinion.

17         The purpose of step two is to identify claimants whose medical impairment is so

18  slight that it is unlikely they would be disabled even if age, education, and experience were taken

19  into account.  Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987).  "The step-two inquiry is

20  a de minimis screening device to dispose of groundless claims."  Smolen v. Chater, 80 F.3d

21  1273, 1290 (9th Cir. 1996).  At this step, the ALJ may decline to find a severe impairment "*only*

22  if the evidence establishes a slight abnormality that has no more than a minimal effect on an

23  individual's ability to work."  Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005) (emphasis

24  in original).  The ALJ's findings of severe impairments at step two satisfied his obligation to

25

26  of it in his decision, finding that plaintiff's "obesity does not severely complicate any of her other
    impairments."  (Id. at 25.)

9

1   make these findings based on the standards set forth here.  Dr. Nolan, however, was under no

2   such legal duty based on his exam of plaintiff.

3             Finally, as discussed in a later section *infra*, the ALJ was permitted to reject Dr.

4   Shearer's opinion because it was based in part on plaintiff's subjective complaints which were

5   discounted.  "An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on

6   a claimant's self-reports that have been properly discounted as incredible."  Tommasetti v.

7   Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008)*, citing* Morgan v. Comm'r Soc. Sec. Admin., 169

8   F.3d 595, 602 (9th Cir. 1999) (*citing* Fair V. Bowen, 885 F.2d 597, 605 (9th Cir. 1989)).

9             Plaintiff also takes issue with Dr. Nolan's report which she claims is "improperly

10  signed," claiming that although the report is signed, it does not state that it was reviewed, and

11  there is strong evidence that it was dictated but not read.  Pl.'s Mot. at 17-18.  The fact that this

12  report was dictated with voice recognition software explains the kind of typographical errors

13  pointed out by plaintiff, all of which are minimal in nature and inconsequential.  Even if the court

14  accepts plaintiff's speculative claim that Dr. Nolan did not review this report before signing it, it

15  was not error for the physician to fail to proofread it.

16     B.  Whether the ALJ Erroneously Failed to Accept the Assessment of Plaintiff's Treating

17  Physician

18            Plaintiff contends that the opinion of her treating physician, Dr. Shearer, was

19  improperly rejected by the ALJ.

20            The weight given to medical opinions depends in part on whether they are

21  proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

22  F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[5]  Ordinarily,

23

24       [5]  The regulations differentiate between opinions from "acceptable medical sources" and
    "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed

25  psychologists are considered "acceptable medical sources," and social workers are considered
    "other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status

26  when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific

10

1   more weight is given to the opinion of a treating professional, who has a greater opportunity to

2   know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th

3   Cir. 1996).

4              To evaluate whether an ALJ properly rejected a medical opinion, in addition to

5   considering its source, the court considers whether (1) contradictory opinions are in the record;

6   and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of

7   a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester ,

8   81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may

9   be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

10   professional's opinion generally is accorded superior weight, if it is contradicted by a supported

11   examining professional's opinion (supported by different independent clinical findings), the ALJ

12   may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

13   Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

14   weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir.

15   2001),[6] except that the ALJ in any event need not give it any weight if it is conclusory and

16   supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999)

17   (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes,

18   881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

19   insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

20              In regard to Shearer, plaintiff's treating physician, the ALJ explained that plaintiff

21   did not regularly complain to him about fibromyalgia or lupus in the period after October, 2002,

22   but she went to this doctor when she needed proof for her Social Security hearing.  (Tr. at 30.)  It

23

24   regulations exist  for weighing opinions from "other sources."  Opinions from "other sources"
accordingly are given less weight than opinions from "acceptable medical sources."

25       [6]  The factors include: (1) length of the treatment relationship; (2) frequency of

26   examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
(5) consistency; (6) specialization. 20 C.F.R. § 404.1527

1   was at this time that plaintiff's attorney solicited Dr. Shearer to complete a residual functional

2   capacity form which the attorney had specially prepared for plaintiff based on her subjective

3   complaints rather than the objective evidence.  Despite the lack of complaints, Dr. Shearer noted

4   in this form, dated some two and a half years later, that plaintiff had diagnoses of chronic pain,

5   systemic lupus erythematosus, migraines, rheumatoid arthritis, fibromyalgia, irritable bowel

6   syndrome, asthma, hepatitis C, anxiety, depression, and Raynaud's syndrome.  (Id., tr. at 329.)  It

7   is interesting to note, as the ALJ did, that Dr. Shearer stated that plaintiff "had a positive

8   fibromyalgia 18 tender point test in January 2005 (perhaps meaning 2006) but that she had not

9   seen a rheumatologist since 2000." (Id. at 30, 331.)  Dr. Shearer felt that plaintiff would be

10  absent from work due to depression or lupus for four or more days per month.  (Id. at 332.)  The

11  ALJ gave this report limited weight as Dr. Shearer's treatment notes did not support these limits.

12  Furthermore, this report was a check off form which the ALJ was correct in discounting.  See

13  Murray v. Heckler, 722 F.2d 499, 501 (9th Cir. 1983) (expressing preference for individualized

14  medical opinions over check-off reports).

15      The ALJ also noted that plaintiff's credibility was extremely damaged, due in

16  large part to her drug use at various points during the alleged period of disability, which she did

17  not reveal to any of her doctors, and did not admit until the hearing.[7]  (Id. at 30, 33.)  The ALJ

18  relied on plaintiff's history of drug manufacturing during her disability period to show that

19  plaintiff could do significant activity during that time.  The ALJ concluded that plaintiff appeared

20

21      [7]   The ALJ discussed plaintiff's credibility in further detail, but it will not be discussed
        here as plaintiff has not contested the ALJ's credibility finding.

22          In regard to drug and/or alcohol abuse, there is conflicting evidence as to plaintiff's
        current use which has been mentioned a few times in the record and acknowledged by the ALJ.

23      (Tr. at 33, 187, 188, 385, 390.)  The ALJ referred to drug use which may have exacerbated her
        physical problems; yet plaintiff's friend testified that she had never seen evidence of drug use

24      during their two year friendship.  It is not clear whether plaintiff has recovered for a sufficient
        time such that drug/alcohol abuse would not interfere with her ability to work.  However,

25      plaintiff, of course, does not raise the issue as to do so may well preclude benefits on a per se
        basis.  The ALJ has not analyzed the issue.  See Bustamante v. Massanari, 262 F.3d 949 (9th Cir.

26      2001).  Nevertheless, no one raises the drug/alcohol issue, and the court will not raise it sua
        sponte.

to be exaggerating her symptoms to get her benefits reinstated.  (Id. at 33.)   The ALJ also

explained that he was placing more weight on Dr. Nolan's report because he was a Board

Certified Internal Medicine Specialist[8] and therefore more experienced in plaintiff's condition

than Dr. Shearer, who was a general practitioner.[9]  (Id. at 31, 33.)  The ALJ also referred to Dr.

Shearer's October, 2002 notes that plaintiff was much better and did exercises.  (Id. at 31, 190.)

        In summarizing Dr. Shearer's records, the ALJ pointed out that plaintiff had

solicited a letter from this doctor to get her electricity turned on after failing to pay bills, in order

to prevent loss of fingers due to the extreme cold and its effects based on her Raynaud's

phenomenon.  This letter, dated January, 2002, paints plaintiff in worse shape than his treatment

notes from that time period.  (Id. at 195.)  For example, treatment notes from that same date

indicate that plaintiff's anxiety had increased but was "fairly well controlled."  Although plaintiff

described increased back pain, her neurovascular exam was intact, other than tenderness in the

lower back.  (Id. at 194.)  On October 23, 2002, Dr. Shearer reported that plaintiff's low back

pain with fibromyalgia was much better.  Her prescription narcotic use had also decreased.  (Id.

at 190.)

        Dr. Shearer's own records indicate the objective findings were not as severe as

plaintiff alleged.  For example, after a car accident in March, 2003 wherein plaintiff hit a

pedestrian who ran in front of her car, plaintiff complained of back pain as well as shooting pain

down both legs.  At first Dr. Shearer thought plaintiff had a herniated disc and planned an MRI

which was done in May, 2003.  (Id. at 28, 184.)  It indicated probable nerve root sheath cyst, mild

---

    [8] Plaintiff claims that there is no evidence that Dr. Nolan is an internal medicine
specialist, other than his own designation.  An internet search resulted in consistent feedback that
his physician is an internist, and plaintiff has not provided evidence otherwise.  See
www.healthgrades.com; www.drscore.com.  It is true that Dr. Nolan is not a rheumatologist;
however, as an internist, he has more education and training than Dr. Shearer.

    [9] Contrary to plaintiff's assertion, the ALJ did not reject Dr. Shearer's report in favor of
Dr. Eder's report, but rather relied on Dr. Nolan's report along with all of the other evidence of
record, including Dr. Eder's report.

1   disc bulge with mild canal stenosis and mild concentric disc bulges with no significant canal or

2   foraminal stenosis, and no herniated disc.  In fact, the disc bulge was less prominent than in a

3   previous study dated March, 2000.  (Id. at 29, 198.)  Furthermore, a previous MRI from 2000 had

4   indicated the nerve sheath cyst had been present since that time.  (Id. at 29, 183.)  Based on this

5   MRI, Dr. Shearer opined that plaintiff's symptoms were "pretty much stable and fairly quiescent

6   now."  (Id. at 29, 183.)

7          Other records by Dr. Shearer indicate that plaintiff's condition was not severe.

8   See e.g. tr. 319 (hospital discharge record noting *history* of various ailments but only actual

9   diagnoses were headaches, body aches, fever, right index finger wound); 186 (pain controlled

10  with oxycodone but plaintiff taking too much, asthma bronchitis resolving with abstinence from

11  cigarettes, history of hepatitis C); 188 (nebulizer treatment for asthmatic bronchitis which almost

12  completely resolved wheezing); 189 (inhaler working partially for wheezing but plaintiff

13  encouraged not to smoke).

14         The ALJ also noted large gaps in treatment records during the time plaintiff was

15  allegedly disabled.  For example, in June, 2004, Dr. Shearer prescribed 180 oxycodone for one

16  month; however, plaintiff did not see Dr. Shearer again, according to the record, until June 2,

17  2005.  (Id. at 29.)

18         Other medical records support the ALJ's reasons.  For example, another state

19  agency reviewer, Dr. Westfall, noted on October 10, 2002, that "there was no interim physical

20  medical record and therefore there was insufficient evidence that claimant met or equaled any

21  listing."  (Id. at 27, 137.)

22         On October 26, 2002, plaintiff was in the hospital for migraines.  During her stay,

23  she was noted to have normal movements and symmetric reflexes in the lower extremities.  Gait

24  was normal.  (Id. at 28, 146.)

25         Another state agency physician evaluated plaintiff's file in January, 2003.

26  Although she did not have the benefit of the entire file, she found plaintiff could do sedentary

14

1    work with some non-exertional limitations.  Dr. Jensen noted medical improvement and limited

2    complaints.  The ALJ gave this report weight, but found plaintiff could do more than sedentary

3    work, explaining that Dr. Jensen did not have the entire file at her disposal.  (Id. at 28, 169-79.)

4             "An ALJ may reject a treating physician's opinion if it is based 'to a large extent'

5    on a claimant's self-reports that have been properly discounted as incredible." Tommasetti v.

6    Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008), citing Morgan v. Comm'r Soc. Sec. Admin., 169

7    F.3d 595, 602 (9th Cir. 1999) (citing Fair V. Bowen, 885 F.2d 597, 605 (9th Cir. 1989)).

8    Furthermore, "the ALJ is the final arbiter with respect to resolving ambiguities in the medical

9    evidence." Id.

> 10    Historically, the courts have recognized conflicting medical
>        evidence, the absence of regular medical treatment during the
> 11    alleged period of disability, and the lack of medical support for a
>        doctor's report based substantially on a claimant's subjective
> 12    complaints as specific, legitimate reasons for disregarding the
>        treating physician's opinion. Flaten, 44 F.3d at 1463-64; Fair v.
> 13    Bowen, 885 F.2d 597, 604 (9th Cir.1989). The ALJ is not required
>        to accept the opinion of a treating or examining physician if that
> 14    opinion is brief, conclusory and inadequately supported by clinical
>        findings. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir.2002).

15

16    Morehead v. Astrue, 2008 WL 3891464, *5 (E.D. Wash. 2008).

17             Based on the inconsistencies between plaintiff's subjective complaints, upon

18    which Dr. Shearer appeared to have relied, and the objective records, as well as other medical

19    source opinions, the ALJ's decision to give plaintiff's treating physician limited weight is

20    supported by substantial evidence.

21           C.  Whether the ALJ's Hypothetical to the Vocational Expert Was Inadequate as a Matter

22    of Law

23             Plaintiff contends that the ALJ erred in posing a hypothetical to the expert that

24    was based on Dr. Eder's RFC assessment as this physician never examined plaintiff.  Plaintiff

25    asserts that the hypothetical instead should have included the limitations imposed by Dr. Shearer.

26    \\\\\

1          Hypothetical questions posed to a vocational expert must include all the

2   substantial, supported physical and mental functional limitations of the particular claimant.

3   Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995); see Light v. Social Sec. Admin., 119 F.3d

4   789, 793 (9th Cir.1997).  If a hypothetical does not reflect all the functional limitations, the

5   expert's testimony as to available jobs in the national economy has no evidentiary value.

6   DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d

7   947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE

8   had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all

9   limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by

10  other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions,

11  based on alternate interpretations of the evidence, substantial evidence must support the

12  hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen,

13  849 F.2d 418, 422 (9th Cir. 1988).[10]

14          In this case, the ALJ's hypothetical was propounded after the hearing which had

15  been suspended due to a necessary neurological evaluation and RFC assessment.  The ALJ later

16  wrote to the expert with the following hypothetical which was based on Dr. Nolan's February 26,

17  2006 neurological evaluation and Dr. Eder's ensuing RFC assessment, dated March 17, 2006:

18  plaintiff could lift and carry twenty pounds occasionally, ten pounds frequently, stand or walk for

19  six hours with normal breaks, sit for six hours with normal breaks, unlimited pushing and pulling

20  "except for the way it's listed above,"[11] occasionally climb, balance, stoop, kneel, crouch, and

21  crawl, and should avoid extreme cold and fumes, odors, gases, and poor ventilation, and hazards

22  such as unprotected heights and moving machinery.  (Id. at 299.)

23

24      [10]  Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a
    hypothetical question propounded by a claimant's counsel."  Magallanes v. Bowen, 881 F.2d

25  747, 756 (9th Cir. 1989).  The ALJ is free to accept them if they are supported by substantial
    evidence or reject them if they are not.  Id. at 756-757.

26      [11]  It is not clear what the ALJ meant by the limitation in quotes.

16

1    The expert responded that based on these limitations, plaintiff could do the jobs of

2  office helper, ticket printer tagger, and laundry assorter.  (Id. at 298.)  The hypothetical is clearly

3  based completely on Dr. Eder's limitations as the ALJ clearly states.  (Id. at 31.)  Despite less

4  weight allocated to this non-examining physician, the limitations imposed by her were based on

5  Dr. Nolan's report and are actually more restrictive than his assessment.  Dr. Nolan imposed no

6  limitations on sitting, walking and standing.  (Id. at 347.)  Dr. Eder limited plaintiff to six hours

7  for each of these activities.  (Id. at 337.)  Dr. Nolan limited plaintiff to occasional bending as did

8  Dr. Eder.  (Id. at 347, 338.)  Dr. Nolan found plaintiff could frequently lift up to twenty pounds

9  and occasionally lift up to forty pounds.  Dr. Eder limited plaintiff to lifting up to ten pounds

10 frequently and twenty pounds occasionally.[12]  (Id. at 337.)   It is clear that the ALJ actually used

11 an abundance of caution to impose more restrictions than were found necessary by Dr. Nolan.

12 Therefore, there was no error in relying on a non-examining report when an examining doctor's

13 report would have imposed less restrictions.

14    The ALJ was not required to rely on Dr. Shearer's more restrictive limitations for

15 the reasons stated in the previous sections.  Because the hypothetical to the vocational expert

16 accurately reflected plaintiff's limitations, substantial evidence supports the ALJ's finding in this

17 regard.

18 \\\\\

19 \\\\\

20 \\\\\

21 \\\\\

22 \\\\\

23

---

24    [12] Dr. Nolan also found plaintiff should not do frequent twisting or turning and should
   avoid frequent repetitive high impact activities, but the RFC form completed by Dr. Eder did not
25 include these categories of activities.  The DOT indicates that none of the jobs suggested by the
   expert require these activities.  See  DICOT 239.567-010 (office helper), 652.685-094 (ticket
26 printer tagger), 361.687-014 (laundry assorter).

1   CONCLUSION

2          Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment is

3   denied, the Commissioner's Cross Motion for Summary Judgment is granted, and judgment is

4   entered for the Commissioner.

5   DATED: 06/18/09                                    /s/ Gregory G. Hollows

6                                                      _____
                                                       GREGORY G. HOLLOWS
7   GGH/076                                            U.S. MAGISTRATE JUDGE
    Johnson0182.ss.wpd
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

18